## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **VALLEY VIEW DEVELOPMENT, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 08-CV-363-TCK-FHM** |
| | ) | |
| **UNITED STATES OF AMERICA, ex rel.** | ) | |
| **United States Army Corps of Engineers,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Before the Court are Defendant United States of America's Motion to Dismiss Plaintiff's

Claim as Untimely ("Motion to Dismiss") (Doc. 40); Plaintiff Valley View Development, Inc.'s

Motion for Summary Judgment (Doc. 28); Defendant United States of America's Motion for

Summary Judgment on Plaintiff's Claim (Doc. 50); Defendant United States of America's Motion

for Partial Summary Judgment on Defendant's Counterclaim (Doc. 51); Valley View Development,

Inc.'s *Daubert* Motion to Exclude Testimony of Stephen LeBlanc and Jason Harrell (Doc. 52); and

United States of America's *Daubert* Motion to Exclude Certain Testimony of Timothy McCrary

(Doc. 53).

## I.      Background

This case arises from an easement taken by the United States in 1943 pursuant to the

Declaration of Taking Act ("DTA"), 40 U.S.C. § 258a (currently codified at 40 U.S.C. § 3114).  At

the time of the taking in this case, the statute provided:

> In any proceeding in any court of the United States . . . the petitioner may file in the
> cause, *with the petition or at any time before judgment*, a declaration of taking signed
> by the authority empowered by law to acquire the lands described in the petition,
> declaring that said lands are thereby taken for the use of the United States.  Said
> declaration of taking *shall contain or have annexed thereto*:

(1) A statement of the authority under which and the public use for which said lands are taken.
(2) A description of the lands taken sufficient for the identification thereof.
(3) A statement of the estate or interest in said lands taken for said public use.
(4) A plan showing the lands taken.[1]
(5) A statement of the sum of money estimated by said acquiring authority to be just compensation for the lands taken.

40 U.S.C. § 258a (footnote and emphasis added).[2]   Thus, in order to properly effectuate a taking, the Untied States must submit these five required items, and they are annexed to and incorporated in the declaration.  *United States ex rel. & for Use of Tennessee Valley Auth. v. Easement & Right of Way Over Two Strips of Land in Trigg County, Ky.*, 249 F. Supp. 747, 750 (D. Ky. 1966) (explaining that the "map showing the exact manner in which the transmission line will be built, including the number and height of poles, their exact location, and other details, becomes a part of the declaration of taking").

With respect to the general procedure followed in DTA cases, one court has explained:

Under the general condemnation statutes and the Federal Rules of Civil Procedure, the government may elect to condemn property. To do this a declaration of taking is filed detailing the authority for the condemnation, a description of the lands taken, and the public use for which the lands are required. Additionally, the estimated amount of just compensation must be deposited in the court. After this has been done, title vests in the United States. If the landowner does not believe that the estimated compensation accurately reflects the value of the land taken, he is, with two exceptions, entitled to have this issue determined by a jury. The first exception is in cases in which the court determines that valuation should be resolved by a

_____

[1]  A "plan" is typically some type of visual depiction or map of the lands taken.  *See generally*
*United States v. Acquisition of 0.3114 Cuerdas of Condemnation Land More or Less, Located on Calle O'Neill, Hato Rey, Rio Piedras Norte Ward, Municipality of San Juan, P.R.*, 753 F. Supp. 50, 53 (D.P.R. 1990) (stating that a declaration must contain a "depiction" of the land taken).  In this case, the parties describe the "plan" as "plan maps" or "sketch maps" for each tract.

[2]  The DTA has been slightly modified but remains substantially the same as it existed in 1943.

commission of three persons, and the second is when Congress has expressly established a tribunal to determine the amount of compensation due.

*United States v. 21.54 Acres of Land, More or Less, in Marshall County, State of W. Va.*, 491 F.2d 301, 304 (4th Cir. 1973); *see also United States v. 729.773 Acres of Land, More or Less, Situated in City and County of Honolulu,* 531 F. Supp. 967, 972 (D. Haw. 1982) (explaining that "Declaration of Taking Act is a supplementary condemnation statute which is permissive in nature and designed to permit prompt acquisition of title by United States, pending condemnation proceeding, upon deposit in court of estimated compensation required").

In a DTA proceeding, "the general rule is that the extent of the take is a discretionary decision for the condemning authority which may not be modified by the judiciary." *21.54 Acres of Land, More or Less, in Marshall County*, *State of W. Va.*, 491 F.2d at 304; *see Narramore v. United States*, 960 F.2d 1048, 1050 (Fed. Cir. 1992) ("When the Federal Government initiates eminent domain proceedings, federal courts lack authority to expand or contract the property or estate described in the condemnation filing."). Instead, the condemning court's role is limited to fixing, through jury trials or other various methods, the amount of just compensation owed to the private property owner. *See Narramore*, 960 F.2d at 1050. After the amounts of just compensation are determined, they are "awarded in said proceeding and established by judgment therein." 40 U.S.C. § 258a (now codified at 40 U.S.C. § 3114).

A.      DTA Proceedings in this Case

The following facts are derived from historical, archived records and are not disputed.[3]

---

[3] The parties dispute which of these facts may be considered in deciding the pending motions, but the facts themselves are not disputed.

3

1.    *9/2/43 Petition for Condemnation*

On September 2, 1943, pursuant to the DTA, the United States filed a Petition for

Condemnation ("Petition") in the Northern District of Oklahoma, in Civil Case No. 1075 ("Case

1075"), explaining that certain congressional acts authorized the Federal Works Administrator "to

acquire land for use in connection with the Grand River Dam Project in the State of Oklahoma."

(Pl.'s Resp. to Def.'s Mot. to Dismiss, Ex. 1 at 003.)[4]   The Petition provides that the Administrator

of the Federal Works Agency:

> has selected for acquisition . . . a perpetual easement upon and over the lands
> hereinafter described to inundate, submerge, and flow; to cut and clear all timber
> therefrom and to remove or require the removal therefrom of all obstructions, natural
> or artificial structures, buildings, fences and other improvements, and to enter upon
> said lands from time to time in performance of said acts, for use in connection with
> the Grand River Dam Project.

(*Id.*)   The Petition further explains the need for taking these perpetual easements and how such

easements relate to the original Grand River Dam Project approved in 1937:

> That on September 11, 1937, the President expressly and definitely approved the
> public works project known as the Grand River Dam (Pensacola) Project for
> combined flood control and power use, embodying the engineering features as
> approved and recommended by the Chief of Engineers of the United States Army
> and adopted by Congress; that said engineering features, among others, provided for
> a dual purpose dam, top elevation 765 above mean sea level; for a storage reservoir
> with pool level for dual purpose, 760 feet above mean sea level; and a total storage
> of 2,440,000 acre feet; *that said dam has been constructed to impound and store the
> waters of said reservoir to elevation 757 feet above mean sea level;* and that all of
> the lands hereinafter described are within the confines and scope of said project as
> originally approved on September 11, 1937, and are necessary in order to complete
> the project in its entirety as approved on said date.

(*Id.* at 003-004 (emphasis added).)   The Petition then provides legal descriptions for the flowage

easements taken by the United States upon thirty-six separate tracts of land.   The descriptions also

---

[4]  This exhibit is the entire case file for Case 1075, which was obtained from the National
Archives and Record Administration and consists of 405 numbered pages.

contain an approximate total acreage.  For example, Tract No. 11 ("Tract 11"), the tract at issue in this case, is described as follows:

Tract No. 11 (24 FW 575)

Flowage Easement

All part of the S1/2 SW1/4 of Sec. 36, T 25 N, R 23 E of the Indian Base and Meridian in Delaware County, lying below Elev. 757 Sea Level Datum, except that portion owned by the Grand River Dam Authority, containing approximately 29.4 acres.

(*Id.* at 005.)  The Petition then sets forth the presumptive fee owners of the various tracts, as gleaned from the public lands records of Delaware County, Oklahoma.  The owners listed for Tract 11 are Everett Clanton and Ruby Clanton ("Clantons").  (*Id.* at 014.)

       2.      *9/2/43 Declaration of Taking*

Simultaneously to filing the Petition, the United States filed a Declaration of Taking ("Declaration"), signed by Baird Snyder, the acting Federal Works Administrator of the Federal Works Agency.   The Declaration provides:

1. (a) *The lands described in Schedule A* hereto attached are hereby taken . . . .
(b) The public use for which the said lands are taken is to provide for the storage of water to be impounded by the Grand River Dam Project . . . .
2.  *A description of said lands sufficient for the identification thereof is set forth in Schedule A, annexed hereto and made a part hereof.*
3.  The estate taken for said public use is a perpetual easement . . . .
4.  *A plan showing said lands is annexed hereto as Schedule B and made a part hereof.*
5.  The sum of money estimated by me to be just compensation for the estate taken . . . is set forth in Schedule A . . . .  Said sum I herewith deposit in the registry of this Court . . . .

(*Id.* at 023-024 (emphases added).)

Schedule A to the Declaration contains legal descriptions for each tract, identical to the descriptions set forth in the Petition, and an estimated amount of just compensation for each.

5

Schedule B consists of drawings, or plan maps, for various tracts. The plan maps depict the relevant tract, contain a hand-drawn line identified on the plan maps as the "757 Contour," and indicate by dashed lines the portion of the tract already owned by the Grand River Dam Authority ("GRDA"). The plan maps comprising Schedule B were completed by W.R. Holway ("Holway"), the Consulting Engineer for the United States in connection with Case 1075. Each plan map contains Holway's professional seal and the following statement: "We certify that this is a true and correct description and plat of a tract of land necessary for the Grand River Dam Project, providing an additional five feet of reservoir storage for the Pensacola Dam." (*See, e.g., id.* at 035.) Schedule B attached to the Declaration, at least as it appears in the archived court file, did not contain plan maps for all thirty-six tracts described in Schedule A and in the Petition. Relevant to this case, Schedule B attached to the Declaration did not contain a plan map for Tract 11.

### 3. *9/2/43 Judgment on Declaration of Taking*

On the same day the Petition and Declaration were filed, the court entered a Judgment on Declaration of Taking ("1943 Judgment"), which makes eight specific findings, including: "[t]hat a proper description of the land sought to be taken . . . is set out in the Declaration of Taking" and "[t]hat a plan map showing the land taken is incorporated in said Declaration of Taking." (*Id.* at 063.) The 1943 Judgment sets forth legal descriptions for the thirty-six tracts and orders that the United States is "vested with a perpetual easement upon and over the lands hereinabove described for the uses and purposes herein stated." (*Id.* at 074.) The 1943 Judgment states that "this cause is held open for such other and further orders, judgments and decrees as may be necessary in the premises." (*Id.*)

4.      *12/6/43 Order Fixing Title for Tract 11*

Upon motion by the Clantons filed December 6, 1943, the court entered an Order Fixing Title, Decreeing Just Compensation and Making Distribution as to Tract No. 11.  This order provides that $2135.50 is the amount of just compensation due for the easement taken on Tract 11 and distributes $853.17 to the Clantons and $1282.33 to State Life Insurance Company, the holder of a mortgage upon Tract 11.

5.      *12/13/43 Amendment to Petition for Condemnation*

On December 6, 1943, approximately one month after filing the Petition and Declaration, the United States filed a motion for leave to amend the Petition, stating that it "ha[d] determined that other persons than those named in said petition are necessary parties defendant, and now desires to amend and supplement said petition, naming the owners and all persons claiming any right, title, or interest in and to said lands as parties defendant."  (*Id.* at 083.)  The motion did not mention, as grounds for amendment, the need to include additional plan maps.  After the court granted the motion to amend, the United States filed the Amendment to Petition for Condemnation ("Amendment") on December 13, 1943.  The Amendment made changes to paragraphs 6 and 7 of the Petition but did not mention the inclusion of previously omitted plan maps.  Nonetheless, in the archived court file, a plan map for Tract 11, (*see id.* at 111), and other tracts that appear to have been omitted from Schedule B attached to the Declaration first appear immediately following the Amendment.  Thus, based on the order of documents as they appear in the archived court file, the Amendment appears to be the first time the United States filed a plan map for Tract 11.[5]

_____

[5]  It is also possible that these plan maps were part of the original Schedule B to the Declaration but were placed out of order in the archived file.  In any event, it is undisputed that the plan map for Tract 11 is part of the record in Case 1075.

7

6.      *2/44 Recording in Delaware County*

In February 1944,[6] the 1943 Judgment was filed with the Delaware County clerk in Book 156 at Pages 497-510.  The 1943 Judgment filed in Delaware County, which is identical to that filed in Case 1075, states that the Declaration of Taking sets forth a "proper description of the land sought to be taken" and that "a plan map showing the land taken is incorporated in said Declaration of Taking."  (Pl.'s Resp. to Def.'s Mot. to Dismiss, Ex. 3 at Book 156, Page 498.)  The Delaware County filing does not mention the Amendment, but the Amendment was part of the court file by the time of this recording.

7.      *Activity in Case 1075 from 12/43-1/45*

During this two-year period, various events happened in Case 1075.  For example, on February 28, 1944, the court appointed three commissioners to "inspect said tracts of land and consider the injury and assess the damages [that property owners] will sustain by reason of the condemnation."  (Pl.'s Resp. to Def.'s Mot. to Dismiss, Ex. 1 at 232.) On March 9, 1944, the commissioners filed a report setting forth "total fair cash market value of the estate taken" for each tract.  Tract 11 was valued at the amount set forth in the Tract 11 Compensation Order, $2135.50.  The owners of certain tracts objected to the amounts set forth by the commissioners and demanded a jury trial to determine the amount of just compensation they were owed.  (*See, e.g., id.* at 252.)  The court conducted such trials and entered judgments consistent with the verdicts.  (*See, e.g., id.* at 308-311.)

---

[6]  "Feb. 44" appears on the last page of the Delaware County filing.

8.      *1/25/45 Judgment*

On January 25, 1945, the court entered a judgment ("1945 Judgment"), ruling upon the United States' motion for a judgment approving the commissioners' report and certain accepted offers as sale.  The 1945 Judgment expressly references the Petition, the Declaration, and "all proceedings had herein" as being "fully considered" prior to its entry.  It does not expressly reference the Amendment.

After setting forth the commissioners' value as to each tract, the court found that "[m]ore than sixty (60) days have elapsed since the filing of the report of commissioners herein, and no written exceptions thereto, nor demands for jury trial are pending, and that said report of commissioners filed herein should be confirmed and approved in every respect, as to the tracts particularly described." (*Id.* at 390.)  With respect to certain tracts, the 1945 Judgment finds that "the report of the commissioners . . . is final and the damages sustained as set out and fixed in said report . . . is full and just compensation." (*Id.* at 392.)  The 1945 Judgment further states that the United States' interest in these tracts, as well as the owners' right to just compensation, "vested in the United States of America on the 2nd day of September, 1943, upon the filing of a Declaration of Taking and depositing the sum of $6662.45 with the registry of this Court."  The court then ordered the United States to pay the sum of $887.60 into the court registry, which was the difference between the original amount deposited and the final amount of just compensation fixed by the 1945 Judgment for the tracts referenced therein.

9.      *2/8/45 Order Fixing Title and Making Distribution*

On February 8, 1945, the court entered an Order Fixing Title and Making Distribution, which sets forth the names of individuals entitled to compensation for each tract, states that "they are the

only persons having any right, title, or interest in and to the funds that are now on deposit," and authorizes the clerk to distribute such funds. (*Id.* at 396.)  This order also sets forth how the amount of just compensation was derived for each tract.  For example, some amounts were fixed in the amount of the commissioners' award, some were fixed based on jury verdict, and some were fixed and distributed by prior orders.  (*See, e.g., id.* at 397 (showing all three types).)  With respect to Tract 11, the order states: "Title fixed and distribution made under order dated December 6, 1943." (*Id.* at 397.)

B.      Parties' Claims and Pending Motions

In this case, Plaintiff Valley View Development, Inc. ("Valley View") is the fee-simple owner of approximately 14.64 acres of land ("the Property") on the shores of Grand Lake in Delaware County, Oklahoma.  Pursuant to the DTA proceedings described above in relation to Tract 11, Defendant United States of America ("United States") owns a perpetual flowage easement on at least some portion of the Property.  The United States claims that the flowage easement encumbers all of the Property, while Valley View claims the flowage easement encumbers only a certain portion of the Property and leaves unencumbered approximately five acres of the Property. Valley View wishes to develop this portion of the Property, and this dispute ensued.

Valley View filed a Complaint to Quiet Title pursuant to the Federal Quiet Title Act ("QTA"), 28 U.S.C. § 2409a.  Valley View seeks a declaration that:  (1) the United States' easement does not impair any portion of the Property lying *above* "Elev. 757 Sea Level Datum"; (2) the United States has no right or interest in the portion of the Property lying *above* "Elev. 757 Sea Level Datum"; (3) the United States' claim to that portion of the Property is cancelled and removed as a cloud upon its title; (4) Valley View's title to this portion of the Property is "quieted and confirmed"

against the United States; (5) the United States' consent to construction and maintenance of certain road improvements on portions of the Property below "Elev. 757 Sea Level Datum" is confirmed; and (6) Valley View has the right to construct and maintain residential, road, utility, and other improvements on any unencumbered portions of the Property.

The United States filed a counterclaim, asserting that its flowage easement encumbers the entirety of the Property and seeking the following equitable relief: (1) directing Valley View to remove, at its own cost, all improvements made to any portion of the Property that is subject to the easement; (2) permanently enjoining Valley View from any further improvement on the Property without approval by the United States Army Corps of Engineers ("Corps"); and, alternatively, (3) authorizing the United States to remove such improvements at Valley View's expense.[7]

Now pending before the Court are: (1) the United States' Motion to Dismiss, wherein the United States argues that Valley View's quiet title action was filed outside the relevant statute of limitations; (2) Valley View's motion for summary judgment, wherein it argues that it is entitled to judgment as a matter of law on its quiet title action; (3) the United States' cross motion for summary judgment, wherein it argues that it is entitled to judgment as a matter of law on Valley View's quiet title action; (4) the United States' motion for partial summary judgment on its counterclaim, wherein it moves for partial summary judgment on the issue of whether certain types of structures violate the

---

[7] By statute, all QTA actions must be resolved by bench trial. 28 U.S.C.A. § 2409a(f) ("A civil action against the United States under this section shall be tried by the court without a jury."). The parties agreed to a non-jury trial of all issues, including the United States' counterclaims. (*See* Docs. 68, 72.)

flowage easement; and (5) the parties' *Daubert*[8] motions, seeking to exclude certain expert testimony.

## II.     Motion to Dismiss (Doc. 40)

The QTA, which provides a limited waiver of the United States' sovereign immunity, is the exclusive means by which adverse claimants may challenge (1) the United States' assertion of title to real property, *see Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation*, 599 F.3d 1165, 1175 (10th Cir. 2010), or (2) the United States' assertion of an easement or some lesser interest in privately owned real property, *see id.* at 1176 (explaining that QTA contemplates adjudication of disputes about lesser interests than fee-simple ownership). An action arising under the QTA is "barred unless it is commenced within twelve years of the date upon which it accrued." 28 U.S.C. § 2409a(g). Because the QTA's statute of limitations defines the scope of the United States' waiver of immunity, the statute of limitations functions as a jurisdictional bar rather than an affirmative defense. *Rio Grande Silvery Minnow*, 599 F.3d at 1175-76.

### A.     Rule 12(b)(1) Standard

A motion to dismiss based on the QTA's statute of limitations challenges the court's subject matter jurisdiction and is properly made pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"). Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction generally take one of two forms. *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001). A moving party may make a facial attack on the complaint's allegations or "may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction is based."

---

[8] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

*Id.*  In this case, the United States relies on evidence outside the pleadings and has mounted a factual attack on the Court's subject matter jurisdiction.  In reviewing a factual attack on the existence of subject matter jurisdiction, a court has discretion to consider affidavits and other documents or conduct an evidentiary hearing to resolve disputed jurisdictional facts.  *Stuart*, 271 F.3d at 1225. When a moving party makes a factual challenge to subject matter jurisdiction, a plaintiff ultimately bears the burden of presenting "affidavits or other evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence."  *Southway v. Cent. Bank of Nigeria*, 328 F.3d 1267, 1274 (10th Cir. 2003).  Therefore, unlike a summary judgment analysis pursuant to Federal of Civil Procedure Rule 56 ("Rule 56"), a Rule 12(b)(1) analysis allows the Court to weigh evidence and decide disputed jurisdictional facts.  *See Morrison v. Amway Corp.*, 323 F.3d 920, 922 (11th Cir. 2003) (explaining that Rule 12(b)(1) standard is "far less deferential" to a plaintiff than a Rule 56 standard).[9]

### B.    Accrual of QTA Statute of Limitations

A QTA suit is "deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States."  28 U.S.C. § 2409a(g).  The QTA limitations issue "presents a mixed question of fact and law as to whether the [plaintiff] knew or should have known" of the United States' claim.  *Kinscherff v. United States*, 586 F.2d 159, 161 (10th Cir. 1978).  Because it represents a waiver of immunity from suit, the limitations period "is strictly construed in favor of the United States."  *Rio Grande Silvery Minnow*, 599 F.3d at 1176.

---

[9]  Valley View did not argue for conversion of the United States' Rule 12(b)(1) motion to a Rule 56 motion.  *See generally id.* at 925.  It makes little difference in this case because the jurisdictional issue and the merits will both be decided by the Court.  *See id.* at 929 (finding that district court should have converted Rule 12(b)(1) motion to Rule 56 motion and that court erroneously invaded province of the jury by resolving disputed questions of fact that were intertwined with elements of claim).

13

In clarifying the degree of notice required to start the jurisdictional clock, the Tenth Circuit has recently explained: (1) the United States need not provide "explicit notice" of its claim to the property; and (2) a plaintiff or its predecessors in interest need not have knowledge of the "full contours" of the claim. *Id.* Instead, "'[a]ll that is necessary is a reasonable awareness that the Government claims *some* interest *adverse* to the plaintiff's.'" *Id.* (quoting *Knapp v. United States*, 636 F.2d 279, 283 (10th Cir.1980) (emphases added)). The Tenth Circuit has further indicated that, when the issue is whether a plaintiff "should have known" of the United States' claim, the court is to employ a reasonableness test. *Amoco Prod. Co. v. United States*, 619 F.2d 1383, 1388 (10th Cir. 1980) ("The operative words of the statute 'should have known' import a test of reasonableness."); *see also Poverty Flats Land & Cattle Co. v. United States*, 706 F.2d 1078, 1080 (10th Cir. 1983) (holding that, in order to justify district court's grant of summary judgment in favor of United States on statute of limitations issue, the United States' proposed interpretation of the mineral reservation must have been "so clear that it would have been unreasonable for the plaintiff to believe otherwise").

C.     Analysis

Valley View admits that (1) it and its predecessors in interest had actual notice of the United States' claim to a flowage easement over those portions of Tract 11 "lying below Elev. 757 Sea Level Datum," and (2) it had no intention of developing those portions of the Property "lying below Elev. 757 Sea Level Datum."[10] Valley View contends, however, that the United States first gave notice of its "claim" to a flowage easement over portions of Tract 11 lying *above* "Elev. 757 Sea

---

[10] The quoted language "lying below Elev. 757 Sea Level Datum" is the language used in the Petition, the Declaration, the 1943 Judgment, the 1945 Judgment, and all other relevant documents effectuating the taking.

Level Datum" on or around October 7, 2008, when the Corps advised Valley View to cease construction on the Property. The official notice, according to Valley View, came in a January 2, 2008 letter from the Corps to Valley View's counsel, stating that "the Bay Pointe Subdivision, including the knoll upon which Mr. Vanhooser desires to build, is entirely inside the flowage easement boundaries . . . ." (Pl.'s Resp. to Def.'s Mot. to Dismiss, Ex. 10.) Therefore, Valley View argues that its cause of action to quiet title to those portions of its property lying above "Elev. 757 Sea Level Datum" accrued no earlier than October 7, 2008 and is well within the QTA's twelve-year statute of limitations.

The United States contends that the legal documents filed in Case 1075, including the plan map filed as part of the Amendment, provided sufficient notice that the flowage easement covered the entirety of Tract 11, including any portions at an elevation *above* "Elev. 757 Sea Level Datum." According to the United States, the legal description and plan map, taken together, were sufficient to trigger the statute of limitations in the 1940s, such that any claim to clarify the scope of the taking has long since expired.

The Court has had some difficulty applying Tenth Circuit law to this situation – where neither party disputes that the United States owns an easement and the litigated question is the scope and meaning of the easement. On one hand, the Tenth Circuit has stated that, in order to trigger the clock, a plaintiff need not have knowledge of the "full contours" of the United States' claim to the relevant property interest. *See Rio Grande Silvery Minnow*, 599 F.3d at 1176. In addition, the Tenth Circuit recently explained that a plaintiff need not have knowledge that the United States is asserting its easement rights in a manner that is "adverse" to the plaintiff in order for the clock to begin. *See id.* at 1183 n.5 (expressly distinguishing cases, such as *Michel v. United States*, 65 F.3d 130 (9th

Cir.1995), holding that the statute of limitations accrues when the United States first acts "adversely to the interests" of the plaintiff because such cases involve a *plaintiff* claiming an easement to land owned by the United States, rather than vice versa).[11]  Arguably, then, in every case in which the dispute is over the scope or interpretation of the United States' taking or reservation of rights in privately owned property, the statute begins to run upon execution or filing of the relevant documents so long as the plaintiff has actual or constructive notice of such documents.  Applying this rule strictly, the statute would begin to run even if the relevant filing is unclear and even if the plaintiff would have ultimately prevailed as to its proposed interpretation.

On the other hand, in a case presenting similar facts to those presented here – *i.e.*, a dispute over the interpretation of language used in the documents giving rise to the United States' claim over the disputed property – the Tenth Circuit indicated that filing or execution of the relevant documents does not start the clock for every type of dispute.  In *Poverty Flats Land & Cattle Company v. United States*, 706 F.2d 1078 (10th Cir. 1983),[12] the plaintiff's predecessor in interest acquired the land pursuant to an exchange of land under a federal statute, the Taylor Grazing Act.  The relevant "land patent" related to this exchange reserved to the United States the rights to "[a]ll mineral deposits in the land so patented, and . . . the right to prospect, mine, and remove such deposits from

---

[11]  Valley View relies extensively on this line of cases, including *Michel*, addressing when the clock begins for a QTA claim involving a private individual's easement upon land owned by the United States.  (*See* Pl.'s Resp. to Def.'s Mot. to Dismiss 16 ("This case is similar to *Werner*, *Michel*, and *Burlison* in that Valley View did not have reason to believe the Corps was asserting its flowage easement encumbered that portion of the Property above the 757 Contour until October 2007 . . . .").)  Based on the Tenth Circuit's reasoning, *Michel*'s "adversity" analysis is inapposite in cases involving a dispute over an easement owned by the United States.

[12]  This case was cited by the Ninth Circuit as an example of cases suggesting that the statute of limitations is not triggered "when the United States' claim is ambiguous or vague."  *See State of Calif. v. Yuba Goldfields, Inc.*, 752 F.2d 393, 397 (9th Cir. 1985).

the same . . . ." *See id.* at 1079 (internal quotations omitted).[13] After the United States' lessee began

removing a substance known as "caliche" from the plaintiff's land, the plaintiff sued under the QTA.

The parties disputed whether caliche was a "mineral" within the scope of the United States'

reservation.  The district court held that the plaintiff's claim was time-barred by the statute of

limitations, apparently assuming that the patent gave sufficient notice to the plaintiff and its

predecessor that caliche "might be claimed under the reservation." *Id.* at 1080.

The Tenth Circuit reversed the district court's grant of summary judgment, holding that

"[g]iven the unsettled state of the law [as to whether caliche is a mineral], we believe a material

issue of fact exists as to whether the plaintiff knew or should have known of the claim of the United

States to . . . caliche at the time the mineral reservation was executed." *Id.*  The Tenth Circuit

reasoned:

> If [the plaintiff] were seeking a declaration that the mineral deposit reservation was
> invalid, the action would be time-barred by the recitation in the patent, of which [the
> plaintiff] would have at least constructive notice.  But [the plaintiff] declares that it
> is not contesting the government's rights to "mineral deposits" within the terms of
> the deed reservation. Rather, this is a dispute over the meaning of the language in the
> patent conveying the land: Poverty Flats contends that under a proper construction
> of the instrument dirt, rock, and caliche were not reserved to the government. In
> *Kinscherff v. United States*, 586 F.2d 159, 161 (10th Cir. 1978), we said, "[T]he
> limitation issue is a mixed question of fact and law as to whether a patentee or a
> successor in interest knew or should have known of the Government's claim."
> Therefore, to justify the district court's conclusion that the limitations period has run,
> *the inclusion of dirt, rock, and caliche in the mineral reservation must be so clear
> that it would have been unreasonable for the plaintiff to believe otherwise.*

*Id.* at 1079 (emphasis added).  Thus, the court remanded the case for resolution of disputed questions

of material fact relevant to determining at what point in time the plaintiff "reasonably" should have

known of the United States' claim to "caliche" as part of its mineral rights.

---

[13] The reservation of mineral rights was similar to the flowage easement taken in this case
because it reserved a non-possessory interest encumbering a private owner's title.

Much like the court in *Poverty Flats Land & Cattle Company*, the dispute in this case is over the meaning of the language in the easement, not the validity of the original taking or reservation. Just as the Tenth Circuit concluded in *Poverty Flats Land & Cattle Company*, the Court concludes, for reasons explained in greater detail *supra* Part III, that the legal meaning of the easement in this case is not "settled" by case law or other available sources.  Instead, the Court concludes that, in analyzing the statute of limitations question, it is necessary to conduct a full evidentiary hearing, weigh competing testimony, and resolve disputed jurisdictional questions.  These questions include but are not limited to: (1) the factual and historical circumstances surrounding the taking, (2) the Corps' conduct in relation to the easement, and (3) the Clantons' and subsequent owners' conduct in relation to the easement.  In addition, the Court finds that expert testimony and expert-sponsored exhibits will assist the Court in discerning the meaning of terms used in the legal description and the technical drawings comprising Case 1075, all of which will inform the question of when the statute of limitations accrued.

In sum, the Court rejects the United States' assertion that the "reasonableness" question may be decided in its favor based on the evidence it presented, which consists of legal documents filed in Case 1075 and Delaware County.  The Court also rejects Valley View's assertion that the "reasonableness" question may be decided in its favor based on legal documents and additional evidence it presented regarding the parties' conduct.  The Court instead finds it necessary to hear and weigh evidence, resolve disputed facts, and ultimately determine whether Valley View has satisfied its burden of presenting "evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence."  *Southway*, 328 F.3d at 1274; *see also Rio Grande Silvery Minnow*, 599 F.3d at 1168 (explaining that district court conducted a bench trial on question

of whether QTA claim was time-barred and made several findings of fact related thereto, including historical facts and circumstances surrounding relevant deeds).

Ordinarily, the Court would proceed by conducting an evidentiary hearing to resolve disputed jurisdictional facts presented by the Rule 12(b)(1) motion in the first instance. However, in this case, (1) all claims will be tried to the Court; (2) the Court has determined that the "merits" – namely, the interpretation of the easement – presents an ambiguity and requires resolution of disputed questions of fact, *see supra* Part III; and (3) there is substantial overlap between the jurisdictional evidence and the merits evidence. In these unique circumstances, the Court exercises its discretion to conduct the "evidentiary hearing" on the United States' Rule 12(b)(1) motion to dismiss simultaneously to the "bench trial" on the merits. *See Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1238 (11th Cir. 2002) (explaining that "[i]n essence, the district court conducts a bench trial on the facts that give rise to its subject matter jurisdiction" in resolving a Rule 12(b)(1) factual attack on the existence of subject matter jurisdiction); *see also Aragon v. United States*, 146 F.3d 819, 822 n.2 (10th Cir. 1998) (noting that district court conducted bench trial on the "discretionary function exception," which was an issue relevant to the court's subject matter jurisdiction, simultaneously to a bench trial on "related liability issues").[14]

---

[14] The procedure outlined by the Court was the procedure employed by the district court in the underlying case on appeal in *Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation*, 599 F.3d 1165, 1175 (10th Cir. 2010). *See* Memorandum Op. and Order, Doc. 665, *Rio Grande Silvery Minnow (Hybognathus amarus) v. John Keys, et al.*, No. CV 99-1320 JP/RHS-ACE, at * 4, 45 (D.N.M. 2005) (conducting bench trial on jurisdictional issues and merits of QTA claim and thereafter holding: (1) QTA claims against the United States were time-barred, and (2) alternatively holding that judgment should be entered in favor of United States on the merits of the QTA claims).

III.    **Cross Motions for Summary Judgment on QTA Suit (Docs. 28 and 50)**

In its motion for summary judgment, Valley View argues that: (1) the Court may only consider the four corners of the 1943 Judgment (and not the plan map for Tract 11 filed as part of the Amendment) in construing the meaning of the easement, and that such judgment is clear and unambiguous; (2) the total acreage listed in the 1943 Judgment does not create an ambiguity because it is merely a general description, which is controlled by what Valley View contends is a more "specific" description preceding the total acreage; and (3) alternatively, if the Court finds an ambiguity in the 1943 Judgment, the undisputed extrinsic evidence shows that "the United States and the Corps acted in a manner consistent with the flowage easement encumbering only the land lying below the 757 Contour." (Pl.'s Mot. for Summ. J. 21.)  In response, the United States argues that: (1) the Court must consider the entire judicial record, including the plan maps, in interpreting the easement; (2) the total acreage listed in the legal description may not be ignored as a mere "general description," and (3) the facts regarding the United States' subsequent conduct in relation to the easement are highly disputed and cannot form the basis of a summary judgment in favor of Valley View.

In its own motion for summary judgment, the United States argues that: (1) the Court must consider the entirety of the court record in Case 1075 in interpreting the easement taken; and (2) when the entire court record is construed as a whole, the easement's language is clear and unambiguous.  The United States does not make any alternative argument based on extrinsic evidence.

A.      Rule 56 Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* (citation omitted). However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

B.      Court Will Construe 1945 Judgment

The parties dispute what legal document or documents the Court should interpret in discerning the scope of the flowage easement. Valley View urges the Court to consider *only* the four corners of the 1943 Judgment, which was filed before the Amendment containing the plan map for Tract 11. The United States does not specify a precise document that provides the starting point for the Court's interpretive analysis but simply argues that "[t]he entirety of the conveyance must be considered: the full text of the description, the tract map that visually depicted the boundaries of the taking, the way in which the other easements were taken in the same proceeding and the intention of the parties." (Def.'s Mot. for Summ. J. 6.) The United States contends that the Amendment and all plan maps in the judicial record must be considered because a "plan" is a required element of a taking pursuant to the DTA. The United States further argues that, in order to construe the easement

21

for Tract 11, the Court must consider the easements upon the other thirty-five tracts and the overall impact of the condemnation proceeding, as expressed in the court record.

In interpreting the scope of a judicial taking pursuant to the DTA in a similar case, the Ninth Circuit held that a court must "construe a judgment so as to give effect to the intention of the court, not to that of the parties."  *United States v. 60.22 Acres of Land*, 638 F.2d 1176, 1177-78 (9th Cir. 1980) (interpreting a "final judgment" entered by the court in 1938 in deciding whether that court intended to grant the United States an "unrestricted easement up to an elevation of 96 feet mean sea level" or, as found by the district court, an unrestricted easement "up to an elevation of 72.5 feet mean sea level" and only a "periodic" easement "to flood the land up to 96 feet mean sea level"); *Gila Valley Irrigation Dist. v. United States*, 118 F.2d 507, 510-11 (9th Cir. 1941) (issue presented was meaning of phrase "stored water" used in judicial decree regulating the rights of water users on the Gila River) (court stated that proper analysis was "concerned not with the intention of the parties as in the case of a contract between them, but with the intention of the court as expressed in the decree").  Therefore, the Court concludes that, where an easement is taken by the United States pursuant to the DTA, the condemnation judgment sets forth the intent of the condemning court and is the document that a subsequent court must interpret when a dispute arises as to the scope of the interest taken.

In an issue that appears to be unique to this case, the Court must also determine which judgment – the 1943 Judgment or the 1945 Judgment – is the proper judgment to interpret.  The 1943 Judgment was entered the same day the United States filed the Declaration.  The 1945 Judgment was entered at the conclusion of all proceedings and set the final amount awarded for each tract.  Both judgments contain identical descriptions of the relevant easements.  Ordinarily, it would

be inconsequential which judgment was construed by the Court.  In this case, however, the parties dispute which judgment should be construed because the plan map for Tract 11, which arguably supports the United States' interpretation, first appears in the archived court file at a point in time after entry of the 1943 Judgment but before entry of the 1945 Judgment.

The Court concludes that the 1945 Judgment is the more appropriate judgment to construe in this case.  The Court agrees with the United States that, in ascertaining the intent of the condemning court following the conclusion of a DTA proceeding, it is appropriate to construe the closest thing to a "final judgment" that was entered in Case 1075.  Interpretation of the document most akin to a "final judgment" allows a court to best effectuate the intent of the condemning court, because such judgment is entered at the conclusion of the proceedings and after any amendments to the original petition or declaration have occurred.  *See generally United States v. 76.208 Acres of Land, More or Less in Horsham Tp., Montgomery County, Com. of Pa.*, 580 F. Supp. 1007, 1009 (D. Pa. 1983) (explaining that "amendments to a Declaration of Taking are permitted where the proposed amendment is to rectify a mistake in the original Declaration" and that "[s]uch an allowance is consistent with the Supreme Court's statement that the filing of a Declaration of Taking does not irrevocably vest title in the government") (citing *Catlin v. United States*, 324 U.S. 229, 240-41 (1945) (holding that judgment entered immediately upon declaration of taking was not final, appealable order)).  In this case, the United States moved the court to amend the Petition, and the motion was granted.  Following the Amendment, certain plan maps (including that for Tract 11) first appear in the archived court file.  The Court finds no persuasive reason to interpret an earlier judgment, where there exists a later judgment that was entered after all relevant amendments, proceedings, and filings had occurred.

23

C.     Under<u>What Constitutes "Four Corners" of 1945 Judgment</u>

The parties also dispute what constitutes the "four corners" of the relevant judgment.  "In construing [a] judgment, general rules for the construction of written instruments are applicable." *Spearman v. J & S Farms, Inc.*, 755 F. Supp.137, 140 (D.S.C. 1990).  "Thus, if the judgment is clear and unambiguous, this court must adopt, and give effect to, the plain meaning of the judgment."  *Id.* As with the interpretation of other written instruments, a court must consider only the "four corners" of the judgment and may consider "extrinsic" evidence only in the event of an ambiguity within the four corners of the written instrument.  *Id.*; *see also Gila Valley Irrigation Dist.*, 118 F.2d at 510 (indicating that if judicial decree effectuating taking is not ambiguous, there is no justification for consideration of extrinsic evidence in interpreting its meaning).

Under federal common law, which applies to interpretation of a federal judgment, the underlying court record is generally considered "extrinsic" to a judgment and is therefore to be consulted only in the event of an ambiguity on the face of the judgment.  *See Security Mut. Cas. Co. v. Century Cas. Co.*, 621 F.2d 1062, 1066 (10th Cir. 1980) ("*If* there is any ambiguity or obscurity or if the judgment fails to express the rulings in the case with clarity or accuracy, reference may be had to the findings and the entire record for the purpose of determining what was decided.") (emphasis added); *Ridley v. Phillips Pet. Co.*, 427 F.2d 19, 22 (10th Cir. 1970) (holding that trial court correctly resorted to other parts of judicial record in construing a 1955 judgment because the language in the judgment was not "clearly unambiguous"); *Spearman*, 755 F. Supp. at 140 (explaining that "if the judgment is ambiguous, this court must construe its meaning, and in so doing may resort to the record upon which the judgment was based").

In this case, however, the Court concludes that the entire court record is part of the "four corners" of the 1945 Judgment for three reasons.  First, the 1945 Judgment makes clear that, in entering judgment, it indeed considered the entire court file for Case 1075:

> The Court having fully considered the *petition for condemnation, the Declaration of Taking, and all proceedings had herein*, and the [relevant congressional acts], is of the opinion that the United States of America was and is entitled to take said property . . . ."

(*See* Pl.'s Mot. for Summ. J., Ex. 4, at 392 (emphasis added).)  Before setting forth the easements taken for each tract in the 1945 Judgment, which are identical to the descriptions contained in the Declaration and the Petition, the court expressly indicated its reliance upon the Petition, the Declaration, and, in the Court's view, any amendments thereto that occurred throughout the course of the proceedings.

Second, the DTA's statutory scheme authorizes the United States to "declare" (and, in turn, legally describe) what property is being condemned.  Under these unique circumstances, it is appropriate to consider, at a minimum, the petition, the declaration of taking, and the five statutorily required elements as part of the "four corners" of the condemnation judgment.  Ignoring these requirements, except in cases of ambiguity in the judgment itself, would not advance the ultimate goal of ascertaining the condemning court's intention.  Unlike a typical case in which a court's intention stated in a judgment can be completely divorced from either party's intention as set forth in pleadings and the judicial record, the court's intention in a DTA judgment is, with respect to the property taken, controlled by the United States.  *See 21.54 Acres of Land, More or Less, in Marshall County, State of W. Va.*, 491 F.2d at 304 (stating that "the general rule is that the extent of the take is a discretionary decision for the condemning authority which may not be modified by the judiciary"); *Narramore*, 960 F.2d at 1050 ("When the Federal Government initiates eminent domain

proceedings, federal courts lack authority to expand or contract the property or estate described in the condemnation filing.").

Thus, in interpreting a DTA judgment, a court must ascertain the condemning court's intention, with the understanding that the condemning court's intention as to the *extent* of the taking is necessarily expressed in prior filings of the United States. It is illogical to classify documents as "extrinsic" to the judgment effectuating the taking, when such documents are statutorily required and control the intent of the court ultimately entering the judgment. *See 60.22 Acres of Land*, 638 F.2d at 1178 (considering jury instructions and petition for condemnation as supportive of interpretation of judgment granting flowage easement, without mention of these items as "extrinsic" evidence).

Third, as argued by the United States, a DTA case is somewhat analogous to a contract situation where "several contracts relating to the same matter are made by the parties as parts of one transaction." *F.D.I.C. v. Hennessee*, 966 F.2d 534 (10th Cir. 1992) (applying Oklahoma law). In such a situation, "all of the instruments should be construed together" in determining the meaning of the entire transaction. *Id.* Although this contract law tenet does not have direct application here because the Court is construing a judgment, the tenet is instructive because the 1945 Judgment is a reflection of the entire "taking transaction" accomplished in Case 1075. For these reasons, the Court finds it proper to consider the Petition, the Declaration, the Amendment, and the entire archived court record as part of the "four corners" of the 1945 Judgment.[15]

---

[15] Based on this ruling, it of little import *when* the plan map for Tract 11 was filed with the court. It is undisputed that such map is part of the record in Case 1075 and that the court was aware of such map at least by the time it entered the 1945 Judgment.

D.      Ambiguity in 1945 Judgment

As explained above, "if the judgment is clear and unambiguous, [a] court must adopt, and give effect to, the plain meaning of the judgment." *Spearman*, 755 F. Supp. at 140. "[T]he legal effect of a judgment must be declared in light of the literal meaning of the language used." 46 Am. Jur. 2d *Judgments* § 74. "The unambiguous terms of a judgment, like the terms in a written contract, are to be given their usual and ordinary meaning." *Id.* A judgment is "ambiguous" if it is susceptible to two interpretations. *Ridley*, 427 F.2d at 23; 46 Am. Jur. 2d *Judgments* § 74 ("An ambiguity in a judgment exists when language can be reasonably construed as having two alternative meanings.").

The 1945 Judgment sets forth the legal description of each easement taken and the fair cash market value of the estate taken. With respect to Tract 11, it provides:

Tract No. 11 (24 FW 575)

Flowage Easement

All part of the S1/2 SW1/4 of Sec. 36, T 25 N, R 23 E of the Indian Base and Meridian in Delaware County, *lying below Elev. 757 Sea Level Datum,* except that portion owned by the Grand River Dam Authority, containing approximately 29.4 acres.

TOTAL FAIR CASH MARKET VALUE OF THE ESTATE TAKEN (PERPETUAL EASEMENT) AND ALL DAMAGES TO THE REMAINDER, IF ANY . . . . . . . . . . . . . . . . . . . . . . . $2,135.50

(Pl.'s Resp. to Mot. to Dismiss, Ex. 4 at 385 (emphasis added).) The 1945 Judgment then provides:

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the estate taken *is a perpetual easement upon and over said lands to inundate, submerge and flow;* to cut and clear all timber therefrom and to remove or require the removal therefrom of all obstructions, natural or artificial structures, buildings, fences and other improvements, and to enter upon said lands from time to time in the performance of said acts, for use in connection with the completion and full utilization of the Grand River Dam (Pensacola) Project in Oklahoma.

27

> . . .
> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the estate therein taken, as hereinbefore specifically set forth, is hereby deemed to be condemned and taken for the uses and purposes of the United States of America, and that the just compensation as determined and fixed herein, in the total sum of $7,550.05 . . . is vested in the persons lawfully entitled thereto.

(*Id.* at 392-94 (emphasis added).)

The parties dispute the meaning of the phrase "lying below Elev. 757 Sea Level Datum." Both parties assert that this phrase is clear and unambiguous and can be given a "plain meaning." Valley View contends that the language clearly and unambiguously takes an easement in only property that reaches an elevation or height above "elevation 757." (Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Summ. J. 7.)[16] According to Valley View, the "elevation of property is determinative as to whether it is encumbered by the flowage easement," and the United States' "effort to change the plain meaning of the legal description by misinterpreting the sketch map must be rejected." (*Id.* 8.)

The United States contends that the phrase "lying below Elev. 757 Sea Level Datum," when read in conjunction with the plan maps and the entire judicial record, clearly and unambiguously takes an easement in all property "below" a certain "contour line" depicted on the plan maps as the 757 Contour. According to the United States, the 757 Contour represents the boundary line of a taking, such that all land lying toward the shore of Grand Lake from this boundary line is encumbered, regardless of its actual elevation. The United States argues:

---

[16] In its original motion, Valley View referred to property as being above or below the 757 Contour. In its reply, it ceased to do so and referred to property as being above or below "elevation 757." (*Id.*)

The maps, consolidated and taken as a whole,[17] suggest that the intent of the Declaration was to allow the Government to inundate land on the shore of Grand Lake, up to a certain point.  This point was marked by a contiguous boundary line referred to on the maps as the "757 Contour," and divided land near the water which would be subject to inundation and the area inland which would not.  High ground generally lies beyond the 757 Contour, inland.  Low ground – isolated pockets notwithstanding[18] – lies on the other side of the line, including Plaintiff's property.

(Def.'s Resp. to Pl.'s Mot. for Summ. J. 9.)

The first question is whether the phrase "lying below Elev. 757 Sea Level Datum" has a "plain meaning."  Because flowage easements are routinely taken by the United States, the Court consulted case law to determine if any court had interpreted this or similar easement language as a matter of law.  The Court could not locate, and the parties did not cite, a case in which the precise issue was the meaning of the phrase "lying [above or below] Elev. __ Sea Level Datum."  Most similar are cases in which a property owner subject to a flowage easement attempted to use landfill to raise the surface elevation above a certain level in order to avoid the flowage easement.  *See, e.g., United States v. Fisher-Otis Co.*, 496 F.2d 1146, 1152 (10th Cir. 1974) (government held deed to flowage easement that "covered that portion of certain tracts of land . . . lying below 602 feet mean sea level (m.s.l.)") (holding that "Government's flowage easement prohibits the use of landfill to raise the surface elevation of land below 602 feet m.s.l. to above that level in order to build

---

[17]   In support of this argument, the United States included in its brief a drawing of a "consolidated" version of all the plan maps that are contained in the judicial record for Case 1075. (*See id.* 9.)  Obviously, this consolidated map constructed for purposes of litigation is extrinsic to the 1945 Judgment and has not been considered by the Court in determining whether an ambiguity exists.  The United States' reliance on this "consolidated" plan map, which is depicted within the text of its "summary judgment" brief, underscores that its interpretation is not clear and unambiguous on the face of the 1945 Judgment and its corresponding record.

[18]   The portion of the Property that Valley View seeks to develop is apparently on one of these "isolated pockets" that is on the "low ground" side of the "757 Contour" depicted on the plan maps, but that sits at a higher elevation than the rest of the Property.

structures for human habitation" because this allowance, carried to its logical conclusions, would "allow the removal of all lands presently within the easement areas"); *Hart v. United States*, 945 F. Supp. 1009 (E.D. Tex. 1996) (presenting similar issue).

The Tenth Circuit's discussion in *Fisher-Otis* seems to indicate that elevation is an important component of the legal description, *i.e.*, the land's *elevation* cannot be artificially heightened to remove it from the scope of the flowage easement. However, that case involved slightly different language ("below 602 feet mean sea level" versus "below Elev. 757 Sea Level Datum"), and the Court is uncertain if "mean sea level" and "Sea Level Datum" are identical terms.[19] Further, in that case, the United States conceded that the elevation of the property was the deciding factor and merely contended that the elevation could not be altered to avoid the easement. Here, the United States apparently contends that it is the land's location in relation to the "757 Contour" and not the land's elevation that is the deciding factor. Thus, the Court cannot discern a plain meaning of the

_____

[19]  Neither party provided a definition for the technical term "Sea Level Datum" as part of its statement of undisputed facts. This has contributed to the Court's difficulty in discerning a "plain meaning" for the disputed phrase. One definition of "Sea Level Datum" located by the Court explains that "Sea Level Datum" refers to the National Geodetic Vertical Datum of 1929 and "should not be confused with mean sea level." *See* National Oceanic and Atmospheric Administration, Tides & Currents website, *available at* http://tidesandcurrents.noaa.gov/datum_options.html. Upon review of case law, it seems the United States more commonly uses the phrase "mean sea level" when it takes a flowage easement, although the Court located at least one other case using the phrase "sea level datum." *See Olson v. United States*, 292 U.S. 246 (1934) (discussing treaty that took a flowage easement "up to elevation 1064 sea level datum upon all lands bordering on Lake of the Woods"). In at least one easement, the United States used the two terms together. *See Bistline v. United States*, 640 F.2d 1270, 1273 (Fed. Cl. 1981) (by warranty easement, government acquired right to "intermittently" flood portions of the land "lying above elevation 2062.5 feet above mean sea level, United States Coast and Geodetic Survey Datum"). One court, relying upon expert testimony, defined "mean sea level" as the elevation of an object relative to the "average sea level datum." *Kelley v. United States*, 2009 WL 1439896, at * 2 (E.D. Va. 2009) ("'MSL' or 'mean sea level' is the elevation or altitude of an object relative to the average sea level datum."). At trial, the parties should be prepared to present evidence regarding the meaning of this term.

disputed phrase based on these cases.  Nor has the Court has been able to discern a plain meaning of the disputed phrase from other cases involving flowage easements.[20]

Instead, the Court concludes that the disputed phrase, and the scope of the easement taken upon Tract 11, are susceptible to two alternative interpretations, both of which are reasonably supported by the 1945 Judgment and its corresponding record.  First, the condemning court's intention in the 1945 Judgment could be to grant a flowage easement to "[a]ll part of [Tract 11]" lying below an *elevation* of 757 feet in relation to "Sea Level Datum."  This interpretation advanced by Valley View is supported by: (1) use of the word "Elev."; (2) use of the reference "Sea Level Datum," which appears to be something similar to, although not synonymous with, "mean sea level," and (3) the Petition's explanation that "said dam has been constructed to impound and store the waters of said reservoir to elevation 757 feet above mean sea level."

Alternatively, considering the depiction of the easements in the plan maps annexed to the Declaration and the Amendment, the condemning court's intention in the 1945 Judgment could be to grant a flowage easement to "[a]ll part of [Tract 11]" lying *directionally* "below," or on the shore side of, a contour line depicted on the plan maps as the "757 Contour."  Because the plan maps

_____

[20] Following are other examples of cases involving interpretive questions posed by flowage easements, none of which the Court finds controlling as to the meaning of the disputed phrase in this case.  *60.22 Acres of Land*, 638 F.2d at 1178 (judgment granted "a flowage easement over each of said tracts . . . up to 96 feet above mean sea level") (interpretive issue was whether this easement was unrestricted as to when flooding could occur or whether United States could only flood up to this elevation periodically); *Bistline,* 640 F.2d at 1273 (by warranty easement, government acquired right to "intermittently" flood portions of the land "lying above elevation 2062.5 feet above mean sea level, United States Coast and Geodetic Survey Datum" and "for any length of time" to flood portions of the land "lying below elevation 2062.5 feet above mean sea level") (interpretive issue was whether right to intermittent flooding extended to 2067.5 feet above mean sea level; court held, based on language of easement and without regard to subsequent conduct of parties, that "the right to the intermittent flooding" was not "limited to a specific contour elevation").

completed by Holway depict the "757 Contour" as the takings line, this line purportedly represents "Elev. 757 Sea Level Datum."  Pursuant to this interpretation, small pockets of land that are on the shore side, or the "low ground" side, of the "757 Contour" (such as the "knoll" upon which Plaintiff wishes to build) would be included in the scope of the easement.  This interpretation advanced by the United States is supported by: (1) the plan map for Tract 11 annexed to the Amendment, which appears to depict all land "below" the 757 Contour as subject to the flowage easement; and (2) the total acreage for the condemned portion of Tract 11 listed in the 1945 Judgment, which is 29.4 acres. It is not disputed, for purposes of this motion, that the total acreage supports the United States' interpretation because, under Valley View's proposed interpretation, the total acreage subject to the easement would be something less than this amount.  Valley View urges the Court to ignore the total acreage because it is a "general" description controlled by the allegedly more "specific" language in the preceding sentences.  *See Burgess v. Indep. Sch. Dist. No. 1 of Tulsa County*, 336 P.2d 1077, 1079 (Okla. 1959) ("The general rule is that a particular description of the property conveyed will ordinarily control over a general description in the case of repugnancy.").  However, there is only a "repugnancy" if the disputed phrase has the meaning advanced by Valley View.  There is no repugnancy if the disputed phrase has the meaning advanced by the United States.  Under these circumstances, the general rule does not apply.  *See Geb v. Wilkins*, 399 P.2d 456, 459 (Okla. 1965) (explaining that "where the boundaries are in doubt, the quantity may become an important factor"). Further, as argued by the United States, the language preceding the total acreage is not a "metes and bounds" description and is not necessarily any more "specific" than the total acreage.

Considering all portions of the 1945 Judgment and the judicial record, both interpretations are genuinely plausible.  Valley View's interpretation arguably comports better with the legal

description, which is phrased in terms of an "elevation" above or below "sea level datum."

However, the United States' interpretation arguably comports better with the depictions in the plan

maps of the "757 Contour," the total acreage listed in the legal description, and the overall purpose

of the taking to gain the right to flood certain areas of land around the shore of Grand Lake.[21]   The

Court is simply unable to discern one "plain meaning" of the relevant easement.   Because of this

ambiguity, the Court finds that extrinsic evidence may be considered in construing the scope of the

easement described in the 1945 Judgment and its underlying judicial record.   *See generally Gila*

*Valley Irr. Dist.*, 118 F.2d at 511 (indicating that, if judgment and pleadings do not resolve

ambiguity in judgment effectuating taking, court may resort to extrinsic evidence to construe the

scope of taking).

      E.      Disputed Extrinsic Evidence

      If neither party relies upon extrinsic evidence in support of its meaning, the court may

interpret an ambiguity in a written instrument as a matter of law at the summary judgment stage.

*See* 49 C.J.S. *Judgments* § 313 ("Even in the event that an ambiguity is discerned, so as to permit

reference to extrinsic evidence, the interpretation of the ambiguous language may nevertheless be

determined by the court on a motion for summary judgment where the parties rely upon the written

agreement and do not refer to parol evidence to shed light upon the intended meaning of their

words.").   In addition, if the extrinsic evidence presented do not present a genuine dispute of

material disputed fact, summary judgment may also be appropriate.

---

[21]   The United States argues that it makes no sense to "take flowage easements over substantial portions of land while excepting any spot, no matter how small, that might exceed, by any fraction of an inch, the elevation of the flood control pool."   (Def.'s Resp. to Pl.'s Mot. for Summ. J. 10.)

In this case, Valley View has presented extrinsic facts in support of its proposed interpretation.  Examples of Valley View's extrinsic evidence include:  (1) the affidavit of Timothy McCrary ("McCrary"), proposed expert witness, explaining certain United States Geological Society ("USGS") topographic maps, which purportedly show that a portion of the Property is not subject to "controlled inundation," and that "a portion of the Property would be a small 'island' if the Corps allowed water to flow to the top of the flowage easement" (Pl.'s Mot. for Summ. J., Ex. 2); and (2) numerous facts regarding the parties' conduct in relation to the easements following the 1945 Judgment, which purportedly establish that development of the Property was begun with the tacit approval of the United States.  Valley View also contends that the plan map, should it be considered by the Court, is "erroneous" in that it "failed to depict the southern portion of [Tract 11] that lies above the 757 Contour," citing McCrary's affidavit.  (*See* Pl.'s Mot. for Summ. J. at Fact 7.)

The Court concludes that Valley View's extrinsic facts are disputed and cannot form the basis of summary judgment in its favor.  Most importantly, the United States disputes that the plan map originally drafted by Holway in 1943 was "erroneous" in its depiction of the easement and has presented contrary expert evidence.  In addition, the United States disputes that the meeting referenced in paragraph 20 of Valley View's statement of facts was the type of meeting where it could have, as implied by Valley View, objected to Valley View's development plans.  The United States also disputes that it ever consented to Valley View's placement of a sewer on the Property. With respect to McCrary's testimony, the United States contends that the USGS maps bear no relationship whatsoever to the easement taken in 1943 and cannot be used to determine the extent of the flowage easement.  These and other material factual disputes regarding the extrinsic evidence in the record preclude summary judgment in favor of Valley View.

34

IV.     **United States' Motion for Partial Summary Judgment on its Counterclaim for Injunctive Relief (Doc. 51)**

In this motion, the United States moves the Court for "partial summary judgment" on its counterclaim, which seeks an "order and judgment directing the Plaintiff to forthwith remove, at its own costs, all improvements made to any property it may own within the flowage easement contour line of the original tract, and permanently enjoining the Plaintiff from constructing any further improvement on said property without Corps approval." (Counterclaim, Doc. 14, at 4.) In the Counterclaim, the United States alleges that "the Plaintiff caused improvements, including a roadway, sanitary sewers, electrical services, telephone services, and a decorative fountain, to be placed on the Valley View property." (*Id.* 3.)

In its motion for partial "summary judgment" on the counterclaim, the United States moves the Court to "establish[] by summary judgment ruling that structures, such as pipes, curbing, and lights would constitute a violation of the easement and that placement of fill, similarly, frustrates the purpose of any easement." (Def.'s Mot. for Partial Summ. J. 10.) However, in its statement of facts, the United States presented no evidence regarding whether Valley View has or has not actually placed pipes, curbing, lights, and fill on the Property.[22] Essentially, the United States is asking for a summary "judgment" without setting forth any facts regarding the structures that are actually at issue in this case. Notably, the structures for which the United States requests "judgment" are

---

[22] Recognizing procedural problems with this motion, the United States in its reply seems to limit its request for judgment to "fill" material. The United States argues, citing Valley View's statement of "additional" undisputed facts, that "fill" material has, at some point in time, been placed on the Property. Valley View's contention, however, is that "[n]o fill material has been placed on [the Property] since at least 2002." (Pl.'s Resp. to Def.'s Mot. for Summ. J. on Counterclaim. It is therefore by no means undisputed that Valley View has placed fill on the Property.

different than the structures mentioned in the counterclaim.  The Court will not issue a partial summary judgment for the relief requested, when it is not alleged, let alone undisputed, that Valley View actually seeks to erect these structures or make these improvements.

The United States did not mention the Declaratory Relief Act, 28 U.S.C. § 2201(a), in its Counterclaim or its motion.  Even assuming the United States is requesting some type of summary declaratory relief, the Court would decline to issue such relief because the United States failed, in its motion for partial summary judgment, to demonstrate an "actual controversy" as to these particular types of structures.  *See Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1244 (10th Cir. 2008) (explaining that an actual controversy must be "definite and concrete, touching the legal relations of parties having adverse legal interests," must be "real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts") (internal quotations omitted).  There are no facts presented in the United States' motion that demonstrate an actual and concrete controversy regarding the precise structures for which judgment is requested, and the Court declines to issue such a declaration.  *See Strawberry Water Users Ass'n v. United States*,  576 F.3d 1133, 1142-43 (10th Cir. 2009) (affirming district court's conclusion that it was premature to fashion equitable relief that would compel a particular response to a proposal that had not yet been submitted).  Accordingly, this motion is denied.

## V.       Motions to Exclude Expert Testimony (Docs. 52 and 53)

Valley View moved to exclude the expert testimony of Stephen LeBlanc ("LeBlanc") and Jason Harrell ("Harrell").  LeBlanc is a professional land surveyor employed by the Corps, and Harrell is a professional land surveyor who was specially retained by the United States.  The United

States moved to exclude the expert testimony of McCrary. McCrary is a professional engineer who lives and works in the Grand Lake area and who was involved with the Property prior to this litigation.

A.      Rule 702 Standard

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Ordinarily, a district court must act as a "gatekeeper" in admitting or excluding expert testimony. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004). To fulfill its gatekeeping role, a district court must therefore conduct a two-part inquiry. *Id.* "First, a district court must determine if the expert's proffered testimony – whether it concerns scientific, technical, or other special knowledge – has a reliable basis in the knowledge and experience of his [or her] discipline." *Id.* at 1232-33 (internal quotations omitted). "By conducting a preliminary inquiry into the expert's qualifications and the admissibility of proffered evidence, a district court fulfills its initial obligation under Fed. R. Evid. 104(a) . . . ." *Id.* To determine whether expert testimony is admissible requires a trial court to examine whether the reasoning or methodology underlying the testimony is scientifically valid. *Id.* "Second, in fulfilling its *Daubert* obligations a trial court must also conduct a further inquiry into whether proposed testimony is sufficiently relevant to the task at hand." *Id.* at 1234 (internal quotations omitted). "The Supreme Court has described the consideration of relevant evidence as one of 'fit.'" *Id.* "The trial court must look at the logical

relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact." *Id.*

During a bench trial, *Daubert* standards governing the admissibility of expert testimony must still be met. *Atty. Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009). However, the "gate-keeping" function is less important because "the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial." *Id.* Therefore, "a judge conducting a bench trial maintains greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation." *Id.* at 780; *see Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 635 (6th Cir. 2000) (explaining that "district courts conducting bench trials have substantial flexibility in admitting proffered expert testimony at the front end, and then deciding for themselves during the course of trial whether the evidence meets the requirements of . . . *Daubert* and deserves to be credited").

     B.    <u>LeBlanc and Harrell</u>

Valley View's challenge to LeBlanc and Harrell is that they are not qualified to "testify about the intent of the drafters of the flowage easement." (*See* Pl.'s Mot. to Exclude LeBlanc and Harrell 8.) Valley View argues:

> [LeBlanc and Harrell] may be qualified land surveyors; however, land surveying does not include knowledge, training or even experience in the manner in which W.R. Holway and his associates reacted, behaved, or thought during their work on the Grand Lake project. Moreover, the only intent, if any, that is relevant . . . is that of the court issuing the flowage easement. Thus, Defendant may not present two expert witnesses to opine as to the intent of the engineering company employees who worked on the legal description [of] the flowage easement.

(*Id.* 9-10.) The United States disagrees with Valley View's characterization of the testimony as some type of impermissible "intent" evidence, arguing that these experts are "simply speaking to

the meaning of specific language, expressed in words on a page, not to the internal mental processes of any individual." (*Id.* 14.)

The Court rejects Valley View's arguments for several reasons. First, cases cited by Valley View as standing for the general principle that expert witnesses cannot testify as to the "intent" of a party are inapposite and distinguishable on their facts. *See, e.g., AstraZeneca LP v. Tap Pharmaceutical Prod., Inc.*, 444 F. Supp. 2d 278, 293 (D. Del. 2006) (stating general rule that expert witnesses are not permitted to testify regarding intent, motive, or state of mind) (excluding expert testimony that a company's intent was to utilize certain data and elevate such data's importance, as such testimony invaded province of jury); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 546-47 (S.D.N.Y. 2004) (excluding expert testimony that a drug manufacturer took a particular drug off the market "for safety reasons" because such "expert" opinion was not based on any particular expertise but was simply based on record evidence that was also available to the jury). The Court agrees with the United States that neither Harrell or LeBlanc seek to offer the type of "intent" evidence prohibited in these cases. They are not seeking to offer testimony as to Holway's mental processes; they are simply shedding light on the meaning of the judicial taking, as ultimately expressed by the condemning court in the 1945 Judgment.

Second, expert testimony may be admitted to assist a trier of fact in construing an ambiguity in a technical or scientific written instrument. *See* 32 C.J.S. *Evidence* § 840; *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1988) (explaining general rule that "an expert may not state his or her opinion as to . . . legal conclusions drawn by applying the law to the facts" but allowing expert testimony regarding party's intent in forming a contract because witness testified about "what he thought [the defendant] was doing in light of [the expert's] experience in the

specialized field of oil and gas"); *WH Smith Hotel Servs., Inc. v. Wendy's Int'l , Inc.*, 25 F.3d 422, 429 (7th Cir. 1994) (allowing expert testimony to assist the court in adopting one of three reasonable interpretations of an ambiguous rent provision in a suboperating contract). *Cf. N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997) ("Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible.").

In this case, the Court has found the 1945 Judgment to be susceptible to more than one reasonable interpretation. The 1945 Judgment involves a technical subject matter, technical terms, and technical drawings drafted by a professional engineer. Upon review of their reports, the Court finds that the testimony of professional land surveyors Harrell and LeBlanc will assist this Court, as the finder of fact, in construing the 1945 Judgment. Specifically, these experts will shed light on the meaning of technical terms, technical drawings, and the nature and purpose of the flowage easement condemned by the United States in Case 1075. Valley View can be assured that the Court will not allow Harrell, LeBlanc, or any other expert to invade the Court's role of discerning the meaning of the 1945 Judgment.

C.    McCrary

The United States challenges McCrary's expert testimony on several grounds: (1) he is not qualified to offer any opinions on the question of whether the Property has been elevated by placing "fill" on the land because he is not an expert in soil morphology; (2) he is not qualified to offer opinions regarding the meaning or scope of the easement because he is not a land surveyor; (3) he is not qualified to explain land surveying done by his business partner Rick Rose; (4) there exists an "analytical gap" in certain of his conclusions; (5) his testimony is not helpful because it is

"inconsistent" and "equivocal"; and (6) he did not personally draft his Rule 26 expert report but instead merely ratified a report drafted by Valley View's counsel.

With respect to the first five grounds for exclusion, the Court exercises its discretion to allow McCrary's testimony at trial. After hearing the testimony and any cross-examination (which may include questions regarding qualifications and any other *Daubert* issues), the Court will exclude from its consideration any testimony or opinions that McCrary is not qualified to provide, that are based on an unsound methodology, or that are not helpful to the Court. *See Tyson Foods, Inc.*, 565 F.3d at 780; *Gonzales,* 225 F.3d at 635. The Court will make any necessary *Daubert* rulings regarding McCrary in its Findings of Fact and Conclusions of Law.

With respect to the sixth argument – that McCrary was not sufficiently involved in the drafting of his expert report – the Court will not strike McCrary's expert report or preclude him from testifying on this basis. The United States cited a case in which a court struck an expert report because the expert's participation in preparing the report amounted to no more than providing a signature. *See Bekaert Corp. v. City of Dyersburg*, 256 F.R.D. 573, 579 (W.D. Tenn. 2009). The United States then cited portions of McCrary's deposition testimony in which McCrary admitted that he did not draft his expert report. In response, Valley View cited McCrary's deposition testimony stating that the report drafted by counsel was based upon his earlier affidavit, which had been significantly edited and reviewed by McCrary and which was attached to Valley View's Motion for Summary Judgment. In addition, McCrary testified that a November 2007 letter he drafted prior to this litigation was the "framework" of the original affidavit. In reply, the United States argued that there are discrepancies between the November 2007 letter and the subsequent affidavit/expert report indicating that McCrary was not actually involved in preparing either.

41

The Court has reviewed McCrary's deposition testimony and the report. The Court finds that the report satisfies the requirements of Rule 26(a)(2)(B) and reflects an adequate amount of participation by McCrary in its preparation. Specifically, the report is based on a prior affidavit that McCrary had a significant role in preparing. Therefore, the Court will not strike the expert report or preclude McCrary from testifying. Any discrepancies between the November 2007 letter and the documents prepared for this litigation are subjects for cross-examination but are not sufficient to warrant the remedies requested by the United States.

## VI.     Conclusion

Defendant United States of America's Motion to Dismiss Plaintiff's Claim as Untimely (Doc. 40) is HELD IN ABEYANCE pending the Court's consideration of relevant evidence; Plaintiff Valley View Development, Inc.'s Motion for Summary Judgment (Doc. 28) is DENIED; Defendant United States of America's Motion for Summary Judgment on Plaintiff's Claim (Doc. 50) is DENIED; Defendant United States of America's Motion for Partial Summary Judgment on Defendant's Counterclaim (Doc. 51) is DENIED; Valley View Development, Inc.'s *Daubert* Motion to Exclude Testimony of Stephen LeBlanc and Jason Harrell (Doc. 52) is DENIED; and United States of America's *Daubert* Motion to Exclude Certain Testimony of Timothy McCrary (Doc. 53) is DENIED.

ORDERED THIS 14th day of June, 2010.

**TERENCE KERN**
**United States District Judge**